## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF KANSAS

Miriam Martin,

        Plaintiff,

v.                                      Case No. 11-CV-2179

Olathe Health System, Inc.
and Olathe Medical Center, Inc.,

        Defendants.

### MEMORANDUM & ORDER

This lawsuit stems from the termination of plaintiff Miriam Martin's employment as a communications operator at defendant Olathe Medical Center.   Plaintiff contends that defendants terminated her employment based on her national origin and in retaliation for plaintiff's engaging in protected activity—both in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq.   This matter is presently before the court on defendants' motion for summary judgment (doc.43).  As explained below, the motion is granted.[1]

I.      **Facts**

Defendant Olathe Health System is a Kansas not-for-profit corporation whose mission is to provide modern medicine and compassionate care to everyone within its service area. Defendant Olathe Medical Center ("OMC") is a Kansas not-for-profit corporation within the

---

[1] In the pretrial order, plaintiff also asserts a state law claim for wrongful discharge and defendants move for summary judgment on this claim.  In her summary judgment submissions, plaintiff has expressly withdrawn this claim.  Defendants' motion on this claim, then, is granted.

Olathe Health System.[2]  Plaintiff Miriam Martin was born in Mexico and came to the United States in 1989 when she was 18 years old.  Prior to that time, plaintiff did not speak or understand English.  After coming to the United States, plaintiff took classes to learn English as a second language.

In December 2009, plaintiff completed and submitted a general application for employment with OMC to apply for open positions which were listed on OMC's website.  In January 2012, plaintiff received an interview for the Communications Operator position.  A Communications Operator is primarily responsible for utilizing the overhead paging system in the hospital to communicate information to physicians, staff, patients and visitors, including paging doctors and other personnel as requested and paging "Code Blue" alerts, fire alerts and emergency calls.  A Communications Operator is also responsible for operating a console telephone switchboard to relay incoming, outgoing and inter-office phone calls.  It is undisputed that it is essential for a Communications Operator to clearly and quickly enunciate information so that the individuals with whom the Operator was communicating could take immediate action.  It is further undisputed that effective oral communication skills, including the ability to be understood by others, was an essential component of the Communications Operator position.

OMC's Communications Supervisor, Sherri Smith, interviewed plaintiff for the position.  Ms. Smith had concerns about plaintiff's pronunciation and, more specifically, about people understanding plaintiff due to her pronunciation and grammar.  Nonetheless, Ms. Smith was

---

[2] In their motion for summary judgment, defendants contend that summary judgment is appropriate in favor of Olathe Health System, Inc. ("OHS") on all claims because plaintiff has not come forward with evidence sufficient to establish that OHS is plaintiff's employer. Because the court concludes that summary judgment in favor of both defendants is appropriate for other reasons, the court declines to address this argument.

impressed with plaintiff and hired her (with the agreement of a human resources representative, who separately interviewed plaintiff) to work as a part-time Communications Operator for a 90-day probationary term.  Plaintiff began her employment with OMC on March 1, 2010 and she reportedly directly to Ms. Smith during her employment.  Sherri Smith, in turn, reported to Dennis Jackson, the Communications Manager, who reported to Peggy Donovan, OMC's Chief Information Officer.  Plaintiff's employment was terminated prior to the end of her probationary term.

During the course of plaintiff's relatively brief employment, Sherri Smith provided ongoing training and feedback to plaintiff regarding her enunciation.  Ms. Smith also recommended to plaintiff that she visit certain websites that she felt would help plaintiff with her oral communication skills.  These websites included practice exercises for individuals learning English as a second language.  It is uncontroverted that plaintiff, with the assistance of Ms. Smith, worked diligently to improve her oral communication skills during the course of her employment.  Nonetheless, Ms. Smith testified that during plaintiff's employment "more than ten" individuals relayed to her that they could not understand plaintiff's pages due to her accent.

In mid-April 2010, Ms. Donovan received an e-mail from an employee advising Ms. Donovan that several staff members had been complaining in recent weeks that they could not understand the overhead pages of "the Spanish person hired in the operator/switchboard" in light of the operator's "thick accent" and slow speech.[3]  Ms. Donovan contacted Sherri Smith via e-

---

[3] Plaintiff objects to evidence of the e-mail complaint received by Ms. Donovan on the grounds that defendants failed to establish foundation for the e-mail and it is unknown who sent the e-mail and whether that person was referring to plaintiff.  The objection is overruled.  The evidence relating to the initial e-mail received by Ms. Donovan is considered only for the

mail for her thoughts on the issue. Ms. Smith responded that she "knew when she hired [plaintiff] that the accent and pronunciation would be a hurdle that we would need to work through," but that she believed that plaintiff would be an asset to the team with continued progress and practice. Ms. Smith advised Ms. Donovan that that she had been working closely with plaintiff on her communication and had suggested to plaintiff that she slow down her speech to see if it would help her communication. Ms. Smith wrote in her e-mail that plaintiff took the suggestion too literally and that she would advise plaintiff to find an appropriate speed and volume when paging overhead. Finally, Ms. Smith mentioned the websites to which she had directed plaintiff and her belief that plaintiff was working very hard to improve her oral communication skills. Ms. Donovan responded in turn that Ms. Smith was "appropriately addressing" the concern and that she hoped that Ms. Smith's "tools and learning aids will help support her." Ms. Donovan concluded her e-mail by stating that it "sounds like [plaintiff] will be an asset to the organization if we can help her improve her pronunciation."

On May 7, 2010, one of the "cath labs" in the hospital notified the operator's station of a "Code Blue" emergency. A Code Blue means that a patient's life is in danger. It is undisputed that "every second counts" when physicians and hospital staff are responding to a Code Blue situation. According to Lucretia Craig, the hospital's Chief Imaging Officer responsible for the implementation of all Hospital policies and procedures, the passing of a few seconds "can be the difference between a good outcome and a bad outcome." Plaintiff received the alert and called the Code Blue page over the paging system. It is undisputed that she called the page incorrectly

---

purpose of showing what prompted Ms. Donovan to contact Sherri Smith. The identity of the author of the e-mail and the accuracy of the e-mail is not relevant. The only relevance is Ms. Donovan's assertion that she received the e-mail and acted on it.

by calling the entire Code Blue response team rather than the smaller team specific to a cath lab Code Blue.  In addition to calling the page incorrectly, defendants contend that plaintiff called the Code Blue so slowly that members of the response team were standing under the speaker and waiting for the completion of the announcement.

After the Code Blue page, Ms. Craig wrote an e-mail to Ms. Donovan expressing her concern about the page.  After briefly mentioned that the page itself was called incorrectly, Ms. Craig wrote:

> Worsening the situation was again, it was called by the person I had concerns about earlier in an email.  The person has a thick Spanish accent and called it very slowly.  I was in the cath lab in the code and Joey Barton commented as all as the physicians while rolling eyes and all . . . this is totally unacceptable.  Time is muscle and for every second that is wasted by 1) not following our code blue calling policy and 2) language barriers, we are costing lives.
>
> Please understand this was clearly a problem.  I believe this is unacceptable and will continue to be a concern of my entire team, the cardiologists and clearly Joey.
>
> Alan will be following up with the supervisor to again assure policy is clear and followed.  However, the language issue I am raising yet again to your level as we have a problem that it [is] not getting better and I fear we are setting not only the person in the position up for failure but the hospital and patient care process up for failure or minimally delays.

Ms. Craig testified that she had voiced her concerns about the clarity of the pages from the operator with the "thick accent" to either Sherri Smith or Dennis Jackson.  According to Ms. Craig, she expressed "significant" concerns about the accent "multiple times" prior to May 7, 2010.  She testified that she took her concern to Ms. Donovan on May 7, 2010 because the situation "was escalating" and her concerns were now related to patient safety in light of the page that occurred during an emergency event.

Ms. Donovan, too, was concerned about the Code Blue called by plaintiff. According to Ms. Donovan, plaintiff utilized a "very protracted pronunciation of the words and location" with pauses between each word. Ms. Donovan testified that she was concerned that the pronunciation of the Code Blue "resulted in confusion and potential delay in our caregivers' response to a critical patient life-saving event." When Ms. Donovan received Ms. Craig's May 7, 2010 e-mail, she visited with Sherri Smith to evaluate plaintiff's employment and her performance, including the prior coaching that plaintiff had received during her employment. She also visited with human resources personnel about the "potential repercussions" of terminating plaintiff, who "has an ethnic background that . . . does not allow her to enunciate clearly so that . . . clinicians and physicians are able to understand her communication." After considering the training and feedback that plaintiff had already received, as well as the circumstances surrounding the Code Blue, Ms. Donovan made the decision to terminate plaintiff's employment.

On May 20, 2010, Ms. Donovan issued plaintiff a termination memorandum in which Ms. Donovan noted that, despite plaintiff's improvements with her diction and clarity of speech, "we are still in receipt of complaints and continue to note that direction provided over the public address system can be unclear or difficult to understand; this occurs especially during high stress times, for example, when emergency codes are being announced." Ms. Donovan summarized in the memorandum that "the ability to enunciate, so as to be reasonably understood by staff and the public, is necessary to perform your duties" and the Hospital had determined that plaintiff was not able to "consistently meet this essential function."

Additional facts will be provided as they relate to the specific arguments raised by the parties in their submissions.[4]


## II.     Summary Judgment Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In applying this standard, the court views the evidence and makes inferences in the light most favorable to the non-movant. *Kerber v. Qwest Group Life Ins. Plan*, 647 F.3d 950, 959 (10th Cir. 2011). A dispute is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party" on the issue. *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Although the court views the evidence and draws reasonable inferences therefrom in the light most favorable to the nonmoving party, the "nonmoving party must present more than a scintilla of evidence in favor of his position." *Id.* (quoting *Ford v. Pryor*, 552 F.3d 1174, 1177-78 (10th Cir. 2008)).


## III.    Discrimination Claim

Plaintiff contends that defendants terminated her employment on the basis of her national origin in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. As

---

[4] Certain facts set forth by defendants have no bearing whatsoever on the issues before the court and the court has disregarded those facts entirely. Defendants, for example, have included as "facts" statements concerning plaintiff's alleged illegal entry to the United States and her alleged failure to pay taxes during the time period when she lived her unlawfully. These statements are unhelpful, irrelevant and the court disregards them. Defendants have also included numerous facts concerning plaintiff's alleged resume fraud but defendants advance no argument concerning that issue. These facts, too, have been disregarded by the court.

plaintiff has no direct evidence of discrimination, her claims are analyzed using the burden-shifting framework set forth in *McDonnell-Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Khalik v. United Air Lines*, 671 F.3d 1188, 1192 (10th Cir. 2012). Under *McDonnell Douglas*, plaintiff has the initial burden of establishing a prima facie case of discrimination. *Id*. (citing *Garrett v. Hewlett-Packard Co*., 305 F.3d 1210, 1216 (10th Cir. 2002)). To set forth a prima facie case of discrimination, plaintiff must establish that she is a member of a protected class; that she suffered an adverse employment action; that she was qualified for the position at issue; and that she was terminated under circumstances giving rise to an inference of discrimination. *Id*.; *Strickland v. United Parcel Serv., Inc*., 555 F.3d 1224, 1231 (10th Cir. 2009). If she establishes a prima facie case, the burden shifts to defendants to articulate a legitimate, non-discriminatory reason for the adverse employment action. *Khalik*, 671 F.3d at 1192 (citing *Garrett*, 305 F.3d at 1216). If defendants meet this burden, summary judgment against plaintiff is warranted unless she shows that her protected status was a determinative factor in the employment decision or that defendants' reasons are pretextual. *Id*.

In their motion for summary judgment, defendants first contend that plaintiff cannot establish a prima facie case of discrimination because she was not qualified for the communications operator position. As evidence of plaintiff's lack of qualifications, defendants rely on their asserted reasons for plaintiff's discharge, including her alleged inability to be understood by others, her alleged inability to clearly enunciate information and her alleged inability to announce Code Blues and Code Reds effectively. Defendants, then, urge the court to consider their proffered nondiscriminatory reasons for terminating plaintiff's employment in connection with analyzing plaintiff's prima facie case. Stated another way, defendants suggest

that plaintiff must disprove defendants' proffered reasons for the termination decision in order to establish her prima facie case. This argument constitutes an impermissible "end run" around the *McDonnell Douglas* analysis and the court cannot consider it at the prima facie stage. *See, e.g., EEOC v. Horizon/CMS Healthcare Corp.*, 220 F.3d 1184, 1192–94 (10th Cir. 2000) (requiring plaintiff to disprove defendant's proffered reason for employment decision to establish prima facie case would inappropriately short circuit *McDonnell Douglas* analysis and frustrate plaintiff's ability to establish pretext).

Because defendants do not otherwise challenge plaintiff's prima facie case, the court turns to analyze whether defendants have met their burden to articulate a legitimate, nondiscriminatory reason for the termination decision. "This burden is one of production, not persuasion; it can involve no credibility assessment." *Carter v. Pathfinder Energy Servs., Inc.*, 662 F.3d 1134, 1149 (10th Cir. 2011) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000)). The Tenth Circuit has characterized this burden as "exceedingly light," and the court finds that defendants have carried it here. *See id*. Defendants assert that they terminated plaintiff's employment because she could not consistently fulfill an essential job requirement—the ability to communicate orally effectively and efficiently so as to be reasonably understood by Hospital physicians, staff and the public. The burden of proof, then, shifts back to plaintiff to show that defendants' proffered reasons are pretextual.

Before turning to plaintiff's pretext evidence, the court addresses defendants' contention that they are entitled to an inference that no discriminatory animus motivated the termination decision in this case because the "same actor" hired and fired plaintiff within a three-month period. The "same actor inference" is based on the notion that it "makes little sense to deduce"

9

that an individual who hires a person—fully aware of that person's national origin or other protected characteristic—would then fire that person a short time later based on that characteristic. *See Antonio v. Sygma Network, Inc.*, 458 F.3d 1177, 1183 (10th Cir. 2006). In *Antonio*, the Tenth Circuit recognized that "in cases where the employee was hired and fired by the same person within a relatively short time span, there is a strong inference that the employer's stated reason for acting against the employee is not pretextual." *Id.* (internal quotations omitted). The court declines to apply the inference in this case. According to defendants, Ms. Donovan made the decision to terminate plaintiff's employment and had approved her hiring less than three months earlier. But while the evidence set forth by defendants demonstrates that Ms. Donovan may have placed a token stamp of approval on the hiring decision, there is no evidence that Ms. Donovan had knowledge of plaintiff's protected status when she approved that decision—a decision essentially made by Sherri Smith. There is no evidence, for example, that Ms. Donovan interviewed plaintiff or otherwise had access to information that would have put Ms. Donovan on notice of plaintiff's national origin. In the absence of such evidence, defendants have not shown that they are entitled to the same actor inference.

The court turns, then, to plaintiff's pretext evidence. Evidence of pretext "may take a variety of forms," including evidence tending to show "that the defendant's stated reason for the adverse employment action was false" and evidence tending to show "that the defendant acted contrary to a written company policy prescribing the action to be taken by the defendant under the circumstances." *Carter v. Pathfinder Energy Servs., Inc.*, 662 F.3d 1134, 1150 (10th Cir. 2011) (quoting *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1230 (10th Cir. 2000)).

A plaintiff may also show pretext with evidence that the defendant had "shifted rationales" or that it had treated similarly situated employees differently. *Crowe v. ADT Servs., Inc*., 649 F.3d 1189, 1197 (10th Cir. 2011).  In essence, a plaintiff shows pretext by presenting evidence of "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." *McDonald–Cuba v. Santa Fe Protective Servs., Inc*., 644 F.3d 1096, 1102 (10th Cir. 2011).

According to plaintiff, the undisputed evidence that she was terminated based on her accent necessarily gives rise to an inference that she was terminated because of her national origin as her accent and her national origin are "inextricably intertwined."  But even plaintiff acknowledges, as she must, that an employer may consider an employee's foreign accent in the context of a termination decision if the accent interferes with the employee's ability to perform his or her job.  *See Baltazar v. Shinseki*, 2012 WL 2369332, at *4 (10th Cir. June 25, 2012).  In *Baltazar*, the Tenth Circuit affirmed the district court's grant of summary judgment to an employer on the plaintiff's national origin discrimination claim in part because the plaintiff did not show that any comments made about her accent were made in a derogatory manner and did not challenge the employer's assertion that the plaintiff's position required the ability to effectively communicate with patients and staff.  *Id*.  In so holding, the Circuit reiterated that "unlawful discrimination does not occur . . . when a plaintiff's accent affects his ability to perform the job effectively."  *Id*. (quoting *Ang v. Proctor & Gamble Co*., 932 F.2d 540, 549 (6th Cir. 1991) and citing *Carino v. Univ. of Okla. Bd. of Regents*, 750 F.2d 815 (10th Cir. 1984)

(implying an employer may consider an employee's foreign accent if it interferes with the employee's ability to perform her job)).

Plaintiff asserts that genuine issues of fact exist as to whether the ability to speak effectively in English is essential to the Communications Operator position because the job description itself does not require that the operator speak English as his or her first language and does not identify the essential functions of the position. Such evidence is irrelevant in light of plaintiff's concessions that, in fact, effective oral communication skills, including the ability to be understood by others, was an essential component of the Communications Operator position. Because plaintiff does not dispute that her position required the ability to clearly and quickly enunciate information, this case is distinguishable from the case relied upon by plaintiff— *Tungol v. Certainteed Corp.*, 202 F. Supp. 2d 1189, 1200 (D. Kan. 2002). In *Tungol*, there was no evidence in the record that the plaintiff's foreign accent interfered with the plaintiff's ability to perform his job. Here, the evidence is undisputed that plaintiff's position required effective oral communications skills and that those skills were reasonably related to the performance of the operator position. For that reason, and because there is no evidence that anyone mocked plaintiff because of her accent or otherwise made statements about her accent in a derogatory fashion, defendant's reliance on plaintiff's accent for the termination decision is not actionable under Title VII. *See Baltazar*, 2012 WL 2369332, at *4.

Plaintiff next contends that a reasonable jury could draw an inference of discrimination from evidence that Marilyn Morgan, a Caucasian employee with no accent, announced a Code Blue that was not understandable because her voice was too low and Hospital staff had to contact the Communications Department because they did not understand the page. Ms.

Morgan was not terminated as a result of the page.  Plaintiff's comparison to Ms. Morgan falls short of establishing pretext.  There is no evidence in the record that defendants experienced any other problems involving Ms. Morgan's oral communication skills.   In contrast, the evidence demonstrates that the Code Blue announced by plaintiff was not the first time that management had concerns about plaintiff's communication skills and her ability to perform her job. Sherri Smith worked with plaintiff on her pronunciation during nearly every shift worked by plaintiff and provided ongoing feedback to plaintiff on her communication issues.  Ms. Craig testified that she expressed concerns about plaintiff's abilities to either Dennis Jackson or Sherri Smith on several occasions prior to the Code Blue.  According to Ms. Craig, the Code Blue called by plaintiff demonstrated that the problems stemming from her oral communications were "escalating" rather than improving and that the "language barrier" had now affected the physicians' and staff's ability to respond to an emergency event.  Plaintiff, then, has not shown that her situation is comparable to Ms. Morgan's situation for purposes of establishing pretext.

Finally, plaintiff highlights that her immediate supervisor, Sherri Smith, and her coworkers believed that plaintiff's job performance was strong in nearly all categories and that plaintiff was making terrific progress with respect to her pronunciation and enunciation.  But a proper challenge of pretext considers the facts as they appear to the person making the decision to terminate plaintiff.  *See Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1231 (10th Cir. 2000).   Neither Sherri Smith nor plaintiff's coworkers made the decision to terminate plaintiff.   In fact, defendants concede that Sherri Smith did not agree with the decision to terminate plaintiff. Ms. Smith testified that she did not necessarily agree with the decision because she believed plaintiff was progressing very well, she was overcoming some difficulties

13

with pronunciation and articulation, she was flexible and willing to work any shift, and Ms. Smith believed she would be a good employee.  Ms. Smith conceded, however, that she believed the termination decision "boiled down to patient safety" and she was not qualified to "make that call."  As explained by Ms. Smith, "I'm not a medical personnel so I rely on the medical staff to provide their opinion" and the medical personnel "believed that there was a risk there and that it was enough of a risk to result in termination."  As summarized by Ms. Smith, "I thought it would be good to keep working with her . . . [b]ut ultimately it does come down to patient safety and that's their area, not mine, to determine what the risks are."  In such circumstances, the perception of Ms. Smith and other non-decisionmakers regarding plaintiff's performance is simply not relevant in determining pretext.  Plaintiff points to no evidence undermining the stated perceptions of Ms. Donovan concerning plaintiff's ability to perform the essential components of the Communications Operator position.  In the absence of such evidence, or any other pertinent pretext evidence, summary judgment in favor of defendants is warranted.


**IV.    Retaliation Claim**

Title VII makes it unlawful for an employer to retaliate against an employee "because [s]he has opposed any practice made an unlawful employment practice by this subchapter." *Khalik v. United Air Lines*, 671 F.3d 1188, 1192 (10th Cir. 2012) (quoting 42 U.S.C. § 2000e–3(a)).  A plaintiff can establish retaliation either by directly showing that retaliation played a motivating part in the employment decision, or indirectly by relying on the three-part *McDonnell Douglas* framework.  *Id*. at 1192-93 (citing *Twigg v. Hawker Beechcraft Corp*., 659 F.3d 987 (10th Cir. 2011)).  To state a prima facie case for retaliation under Title VII, a plaintiff

must show "(1) that [s]he engaged in protected opposition to discrimination, (2) that a reasonable employee would have found the challenged action materially adverse, and (3) that a causal connection existed between the protected activity and the materially adverse action." *Id*. at 1193 (quoting *Twigg*, 659 F.3d at 998) (alteration in original).

In their motion for summary judgment, defendants contend that plaintiff cannot establish a prima facie case of retaliation because no causal connection exists between plaintiff's protected activity and the termination of her employment. More specifically, defendants contend that Peggy Donovan, the primary decisionmaker with respect to the decision to terminate plaintiff's employment, undisputedly had no knowledge of any discrimination complaints made by plaintiff. *See Hinds v. Sprint/United Management Co.*, 523 F.3d 1187, 1203 (10th Cir. 2008) (to satisfy causal connection element, plaintiff must first come forward with evidence from which a reasonable factfinder could conclude that those who decided to fire him had knowledge of his protected activity).

According to plaintiff, in mid-April 2010, Bonnie Smith, one of plaintiff's co-workers, told plaintiff that "she didn't have a problem with Mexicans as long as they work and pay taxes." During the same time frame, Bonnie Smith also told plaintiff that "they come here not to work" and "they take advantage of the United States, of Americans." Plaintiff further testified that Bonnie Smith spoke to her as if she could not understand or speak English (that is, Bonnie Smith spoke to plaintiff using slow, repetitive, deliberate speech) and often told plaintiff that she was difficult to understand. Plaintiff told Sherri Smith about Bonnie Smith's comments and

15

conduct but it is uncontroverted that she did not mention Bonnie Smith's comments or conduct to anyone else.[5]

Plaintiff contends that Sherri Smith's knowledge of her discrimination complaints is sufficient because Peggy Donovan discussed with Sherri Smith whether plaintiff's employment should be terminated such that Sherri Smith should be deemed a decisionmaker.  The court rejects this argument for two reasons.   First, the evidence does not support plaintiff's characterization that Ms. Donovan discussed with Sherri Smith whether to terminate plaintiff's employment.  Ms. Donovan did not testify that she sought input from Sherri Smith about the termination decision.   Rather, she testified that advised Sherri Smith about the termination decision as "a statement of fact" and told Sherri Smith when the termination would occur. Second, it is undisputed that Sherri Smith did not agree with the termination decision and  there is no evidence that Sherri Smith in any way encouraged Ms. Donovan to terminate plaintiff's employment.   In such circumstances, no reasonable jury could conclude that the decision to terminate plaintiff's employment was motivated in any way by Sherri Smith's knowledge of plaintiff's complaints.

---

[5] Plaintiff also suggests that she engaged in protected opposition to discrimination when she complained to Sherri Smith that another coworker, Marilyn Morgan, instructed plaintiff not to use the restroom in the Communications Department office due to an odor that occurred when plaintiff used the restroom.  There is no evidence, however, that plaintiff suggested to Sherri Smith that this comment was based on plaintiff's national origin (and there is no other evidence suggesting that the comment might have been based on plaintiff's national origin) such that the complaint could reasonably be construed as a complaint of discrimination.  Nonetheless, even if it is assumed that the complaint constituted protected activity within the meaning of Title VII, this activity cannot form the basis of a valid retaliation claim because there is no suggestion that anyone other than Sherri Smith had knowledge of the comment.

Plaintiff also contends that a reasonable jury could infer that Sherri Smith told Ms. Donovan about plaintiff's discrimination complaints based on evidence that Ms. Donovan held weekly meetings with Sherri Smith about the Communications Department and evidence that Ms. Donovan knew that plaintiff was having "difficulties with her coworkers." While Ms. Donovan testified that she had a "standing meeting" with Dennis Jackson and Sherri Smith on Tuesday mornings which would typically last from 20 minutes to one hour, there is no evidence that Sherri Smith ever raised the issue of possible national origin discrimination or plaintiff's complaints about national origin discrimination at any of these meetings.  Ms. Donovan testified that the agenda for these weekly meetings consisted of "any outstanding issues and concerns that they had [and] a general update as to the operations."  Any inference from this testimony that Sherri Smith advised Ms. Donovan that plaintiff had complained about national origin discrimination is both tenuous and speculative, particularly when it is undisputed that plaintiff expressly asked Sherri Smith not to communicate her complaints to anyone else in management.

As for plaintiff's contention that Ms. Donovan knew that plaintiff was having difficulties with her coworkers, there is no evidence that Ms. Donovan had any sense whatsoever that any difficulties included conduct that might be considered national origin discrimination.  Ms. Donovan testified that Sherri Smith shared with her that there was "tension" at times in the Communications Department but she could not recall any specific details about who was involved or what had occurred.  She further clarified that the tension described by Sherri Smith was not necessarily tension between plaintiff and her coworkers, but rather "general" tension amongst all the operators in light of the small work space and the stressful environment in which

17

the operators work.  No reasonable jury could conclude from this testimony that Ms. Donovan had notice that plaintiff had complained about national origin discrimination in the workplace.

In the end, the evidence viewed in the light most favorable to plaintiff reflects that Sherri Smith was the only person with knowledge of plaintiff's protected activity and that, to the extent Sherri Smith was consulted in the termination decision, she actually opposed that decision. Accordingly, no reasonable jury could conclude that defendants' decision to terminate plaintiff's employment was in any way motivated by plaintiff's protected activity.  Summary judgment in favor of defendants, then, is appropriate on plaintiff's retaliation claim.  *Jones v. UPS, Inc*., 502 F.3d 1176, 1195 (10th Cir. 2007) (affirming grant of summary judgment on retaliation claim where plaintiff failed to produce evidence that UPS knew he was engaging in protected activity); *Kendrick v. Penske Transp. Servs., Inc*., 220 F.3d 1220, 1235 (10th Cir. 2000) (affirming dismissal of retaliation claim on summary judgment where plaintiff presented no evidence that decisionmaker knew of plaintiff's protected activity at time discharge decision was made); *Sanchez v. Denver Public Schools*, 164 F.3d 527, 534 (10th Cir. 1998) (same).[6]

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendants' motion for summary judgment (doc. 43) is granted.

**IT IS SO ORDERED.**

---

[6] Because the court concludes that plaintiff has not established the requisite causal connection, it declines to address defendants' remaining arguments concerning plaintiff's retaliation claim.

Dated this 13th day of July, 2012, at Kansas City, Kansas.

_s/ John W. Lungstrum_
John W. Lungstrum
United States District Judge